Good morning, your honors. May it please the court, my name is Carmen Smarandoyo. Lower the microphone a little bit so we can hear you. I'm too short. Thank you. May it please the court, my name is Carmen Smarandoyo. I am with the Federal Public Defender in San Francisco and I represent Ms. Gagarin. I would like to reserve two minutes. Ms. Gagarin's appeal presents several challenges to her aggravated identity theft conviction, to her sentence, and to the restitution order. With your permission, I would like to focus today on her aggravated identity theft conviction and to the restitution methodology that the district court used to calculate the restitution award. Turning to the aggravated identity theft conviction, the district court heard from the get-going. It heard the first step of the Jackson-Neville's inquiry. And that error then obviously carried through the second step of the inquiry. The district court found that in this case, the jury could have — that any juror could have reasonably found that Ms. Gagarin submitted a policy on behalf of her cousin without the cousin's consent. We respectfully disagree. And these are the reasons. And is it your position that Ms. Gilroy's, the cousin's testimony has to be taken at face value? Yes, Your Honor. And why is that? A jury can't disbelieve a witness based on the circumstances of her testimony and her demeanor, regardless of anything she says? I think that the circumstances in this case are quite special. I obviously agree with Your Honor that as a general proposition, jurors do have that kind of authority. However, in this case, Ms. Gilroy was the government's witness. She testified pursuant to a grant of immunity. And from the outset of her testimony, the government took pains for the jury to understand that Ms. Gilroy had no incentive to lie because she was immune from prosecution unless she failed to tell the truth. The government, once she set the stage for Ms. Gilroy's testimony, then elicited testimony from her during which she several times, numerous times, stated that she wanted policy, an insurance policy, and wanted her cousin to apply for it. The government did not impeach Ms. Gilroy's testimony, did not offer any kind of contradicting evidence. And even more importantly, in closing argument, the government repeatedly and consistently told the jury that Ms. Gilroy wanted insurance, but she was willing to lie for it. In other words, at every single step, in closing argument, the government told the jury what the most favorable view of the evidence was in its opinion, and that was that Ms. Gilroy wanted a policy. The government – the way I think of this case, Your Honor, is that it is the closest we get to a stipulation without obviously having the traditional stipulation. Both parties agree as to the meaning, as to the import of a witness testimony, including the government who sponsored this testimony. So even if we agree with you that we have to assume Ms. Gilroy wanted the policy, I'm struggling somewhat with how you win anyway, because it seems like Ms. Gagarin made various misstatements that Ms. Gilroy didn't specifically ask for about her marital status, her employment, her salary, and why is it – and then signed her name to fit with those assertions. So why isn't that enough for the conviction, even regardless of whether Ms. Gilroy wanted a policy? It is not okay, Your Honor, because at the very least, it doesn't meet the elements of use during and in relation to a felony predicate, and it does not meet the element of another person. Let me start with the during and in relation to a felony predicate. Ms. – there is – based on her own testimony, it is clear that Ms. Gilroy wanted insurance, and furthermore, instructed Ms. Gagarin to submit what from the get-going was going to be a fraudulent insurance, because she did tell Ms. Gagarin to put down the fact that she was employed, when in fact she was not employed. So that was what Ms. Gilroy wanted. The fact that Ms. Gagarin added some other misstatements about Ms. Gilroy does not change the nature of the fraud. It does not change the fact that Ms. Gilroy wanted insurance, but that insurance is going – that insurance was going to be fraudulent. And it is important to – in thinking about the – So Ms. Gagarin, though, was an insurance broker, right? So presumably she knows what the insurer cares about in terms of whether they're going to grant the policy. I mean, I'm not sure why she would lie for no reason. So maybe marital status had some relation to the likelihood of granting the policy. I mean, how do we – why shouldn't we think that the lies she made were important to this fraud? There is – my argument is not that the lies were not important. My argument is that Ms. Gilroy's means of identification didn't have anything to do with the lie. That to use the – Well, except that she signed it, right? So, I mean, she essentially acts like she's Ms. Gilroy applying for the policy and in the process lies. So how do we separate those? I mean, she purports to be Ms. Gilroy signing those applications, filling out this information that's not true. So it feels like maybe there – it's all tied together. It's important to keep them separate, Your Honor. Ms. Gilroy gave Ms. Gagarin the authority to sign for a policy. That's exactly what she said. But she didn't give authority to misrepresent her marital status and her employment status, correct? She did give – she did give authority to represent – to misrepresent the employment status, but not the marital status. So there is – she didn't give consent to a material fact for the issuance of the policy. It is true, Your Honor. But in – in accomplishing that fraud, Ms. Gagarin did not employ, did not use Ms. Gagarin – Ms. Gilroy's means of identification. And I think it would be useful to actually think about several examples. Going back to the Sixth Circuit decision in Michael and Medlock and maybe Gatwas from the Eighth Circuit, because they provide a much better way to understand this issue. What the Sixth Circuit said is that for this element to be met, the fraud – the means of identification have to further – to further the fraud. However, the fraud is going to be defined by looking at what the facts are. So for example, in Medlock, Medlock was the case in which patients were transported by ambulance, but the defendants misrepresented that they needed that kind of – that kind of transportation. So the fraud was not about the fact that there was a transport and these people existed. It was about the nature of the services. And what the Sixth Circuit said, in that case, the fraud, misrepresenting the nature of the services had nothing to do with the means of identification. By contrast, in Michael, for example, the defendant made up – used the – Kennedy Isn't every representation in an application for insurance, such as marital condition, material to the issuance of the policy? Gilroy It is – it is material, but it is – but the means of identification under the framework that the Sixth Circuit developed in Michael was not – did not further the fraud. Because Ms. – Ms. Gilroy – Kennedy It's real, but it didn't further? Gilroy It did not further – Your Honor, it is true, and that is because Ms. Gilroy wanted insurance, just like the patients in Medlock were transported. The fraud is about – And if so, how is that consistent with Osuna Alvarez? Gilroy She – she certainly did exactly that, Your Honor. She – Kennedy But so Osuna tells us that the fact that someone shared their ID or gave permission to use their ID doesn't stop this from being identity theft. Gilroy Well, Osuna Alvarez is about one element only, which is without lawful authority. That's – that's the only element that the defendants there are challenged. So Osuna Alvarez cannot be governing our reading and interpretation of all the elements. The court still has a duty to determine what if each element of the offense was met. And it is my contention that under the framework that the Sixth Circuit developed in my court, the during and in relation to element, it is not met because Ms. Gilroy wanted insurance. And the fraud, her qualifications for insurance, those – that fraud was not furthered by the – by the means of identification. She wanted insurance. Her presence, her being, her desire was that. Her lack of qualifications had nothing to do with the means of identification. The means of identification didn't make those things less or more true. Just like, for example, in the example, in the hypothetical that GAT was provided, if a tax preparer submits a tax return in which underestimates income or makes some bogus claim, deductions, in that case, the identity of the – of the tax – of the person has nothing to do with the fraud. The fraud is about these numbers, not about the fact that the person existed or is seeking a return. But does the insurance company require a signature on the application because they assume that whoever filled out the application will know the true answers to the questions? I mean, if Ms. Gagarin had signed Gagarin instead of Gilroy, would it have been denied because they'd say, well, who knows if she's giving the right information about Gilroy? I assume so, Your Honor. I assume so. So then – so then it does seem that signing Gilroy's name is part of the representations of what's on the application. But if that is the case, then anything – anything that has somebody's name qualifies. Under that interpretation, anything goes as long as a name is used and – on a document or is referred to in something. And that is the reason – that is the distinction that, for example, Gatwas made, right? Not everything goes. The name, that means of identification actually has to further the fraud or whatever the felony predicate is. And in looking at whether that is true, we look at the nature of the fraud. And the nature of the fraud here is Ms. Gilroy's lack of qualifications, not the fact that she wanted to apply. Her signature obviously means, I want to apply for insurance. I want this insurance. So the means of identification did not – did not further the fraud. And I would point out that even assuming that the Dworyngan in relation to element is not met, we still have the another – another person problem. But how – I think you're going to rely on Spears, and I just don't see how Spears is reconcilable with Osuna Alvarez. It is reconcilable in – in the sense, Your Honor, that Spears is about another person, and Osuna Alvarez, again, is about without lawful authority. There are distinct elements, and this Court has not yet addressed the another-person requirement. And it has to – and I – I think there is a way to reconcile the two lines of cases by limiting Osuna Alvarez to the issue before it and to the facts before it. And I realize that I'm kind of running out of time. I'm not sure if I have just – Do you want to save your time for rebuttal? I am, Your Honor. All right, thank you. Thank you. It's probably the first time I've ever had to raise the microphone. Good morning, and may it please the Court, Kirsten Alt of the United States. Ms. Gagarin's appeal should be denied. First, the jury's verdict in convicting Gagarin of aggravated identity theft was supported by sufficient evidence that she possessed, transferred, or used the identity of her cousin to submit a fraudulent life insurance application by including false information on the application form and forging her cousin's electronic signature. Under this Court's precedent, including United States v. Blixt and United States v. Osuna Alvarez, this conduct constitutes use, possession, or transfer of another person's personal information and is sufficient to sustain the identity theft conviction. Gagarin's argument essentially amounts to an argument that this Court's precedent should be disregarded, and this panel doesn't have the authority to do that, and even if it did, it shouldn't. I'm not sure if this Court has questions that I can address on this issue. I do think that the district court, contrary to what Ms. Gagarin's counsel has represented, the district court did not find that the jury completely disregarded Ms. Gilroy's testimony. What the district court found was that the jury could have concluded from the evidence that Gagarin submitted the application without Gilroy's knowledge. The application, and as this Court has recognized, the application in question contained misrepresentations that Ms. Gilroy said she never agreed to. So the application that Ms. Gagarin actually submitted is not the case. Kennedy, your literary friend says that Gilroy testified that she wanted the policy. She wanted Gagarin to make the application for her, and she consented to Gagarin using deceitful and false information. Your Honor, what Gilroy testified to is that she wanted a policy, but she testified that the important things like the amount of policy and the amount of premium she would have to pay were things she did not ask for and did not agree to. She did not ask to apply for a $300,000 life insurance policy with a $300 a month payment that she could not possibly have afforded. She also did not, she testified she did not agree that Ms. Gagarin could put, she agreed she could put one false statement in the application, which was that she was employed at Metro PCS when she was not. But the rest of the false statements, such as that she was married to her boyfriend, which was material to the application, Ms. Gamble, the AIL's American Life Insurance's Vice President testified that marital status was material because they wanted to make sure that the beneficiary was somebody who had a relationship to the insured to, as a means of prevention. Are there any representations made in the application as to the source of the premiums, where the premiums would come from? Yes. That was another misrepresentation that Ms. Gamble, that Ms. Gagarin made, there's a lot of G's in this case, that Ms. Gagarin made, that Ms. Gilroy did not consent to, which is that Gagarin put in that this Steve Wynn account would be where the premiums would come from. Ms. Gilroy had no knowledge of who Nguyen was, did not agree to it. And one of the signatures that Ms. Gagarin forged on the application was Ms. Gilroy's signature saying, I have control of this account and I consent to money coming out of this account, which is something Ms. Gilroy testified she never agreed to because she didn't even know what that account was. She had no control over it. So in underblix, the forgery of Ms. Gilroy's signature, which signing her name without her consent is forgery, is enough. Well, that part, though, she sort of did consent, right? I mean, she may not have consented to all the things in between, but she did consent to an application in her name. She or at least we maybe did. Maybe. Assuming that we don't take your argument that the jury could have disregarded that. Yes, Your Honor. However, she never testified that she agreed that her cousin could forge her signature. All she said was, I called her up and said, I'd like a policy. And she was not familiar with the electronic application process. She didn't know that you could just put her name in and have her signature appear. She and at no point did she say, I asked her to sign my name for me. And asking somebody to submit a policy for you is not the same as saying I give you authority to forge my signature. And so at no point, there's no evidence that she gave that authority. Certainly, she did not give the authority to sign on the line that said you can withdraw money from Steve Nguyen's account over which I have authority. There is no evidence that she asked or approved for Ms. Guerin to do that. And so under Blixt, that alone is enough to sustain the conviction. Counsel, I'd like to take you back to a question Judge Bea asked at the start of the parents' argument, and that is why isn't the jury just free to believe or disbelieve any part of Gilroy's testimony? Could Gilroy, although she was helping the government, could she have wanted to favor her relative, Ms. Guerin, by saying she consented, even if she didn't consent? Yes, Your Honor. The jury was free to disregard Ms. Guerin's testimony because the Court told the jury they were free to disregard it. That was part of the jury instructions. The jury instructions told the jury you can accept some of the testimony, all of the testimony, or none of the testimony. And then the Court further instructed the jury that they should consider Ms. Guerin's testimony skeptically because she was testifying under a grant of immunity. And what this Court does when looking at the sufficiency of the evidence is look at whether there is sufficient evidence in the record to support the jury's guilty verdict. Regardless of what the parties argued or whose interest the testimony was in, the question is simply was there sufficient evidence. And in this case, as Your Honor noted, the jury could definitely find that there was a motive for Ms. Guerin to testify in her cousin's favor, that her claim that applications were no different than the 14 other witnesses who testified that applications were submitted without their knowledge and consent, in which the same type of information was the same type of misrepresentations were made and their signatures were also forged. So there was sufficient evidence from which the jury could conclude that Ms. Guerin was simply lying and disregard her testimony altogether. However, even if they didn't do that, as we've argued, Ms. Guerin's use of Ms. Guerin's identity under Osuna Alvarez and Blix still violates the statute. Counsel, could you help me a bit, please, to understand the nature of this fraud? It's hard to understand how they were making their money out of this. It's a little unusual in my experience. So could you describe to me what the conspirators were, how they were extracting money by making phony applications? I will try, Your Honor. I admit that it is very confusing because of the way that American Income Life, the insurance company and their subsidiary insurance agents, the way that they paid out commissions and bonuses is how they ended up making money. Because what would happen is if you, as an insurance agent, and if you submitted applications, you got paid based on an advanced commission and a bonus. And the advanced commission, what would happen is as soon as the first premium payment was sent in, the agent would get seven months of advanced commissions paid to them immediately. In addition, if the agent generated a certain amount of business, they would then get bonuses paid on top of that. And so essentially the structure of the conspiracy was to submit bogus life insurance applications, pay premiums through four months, because four months was how long AIL needed to consider the application to be a real application. From bogus Wells Fargo accounts. From bogus Wells Fargo accounts. And then let the policy lapse. So they would get the seven months of advanced commissions. They would get the bonuses on top of that. They would only have to pay out the four months of commissions. So all of the bonuses and the remaining three months of commission were all profit that was made to them. And if you were a supervisory agent like Gagarin was, or her co-conspirators Halali and Magat, you not only got the policies you did, you got the policies that everybody under you did, which is why Gagarin roped in Don Tong and Bata Lopez and other people underneath her to also use their names or give these policies to them and have them issue these policies. Because not only did she get more money from their commissions, also because they were newer agents, the bonuses were higher. Because AIL had higher bonuses to encourage new agents to generate business to retain those, to retain those agents. So that, again, goes into the role adjustment, which is she needed to have these people under her, at her direction, doing these things so that she could make more money. Could you address the, we didn't discuss very much in the opening, the restitution problem. Did the district court err in the restitution order? No, Your Honor. The district court did not err either in the amount of restitution or in the formulation of the restitution order. I'm actually, we'll start with the formulation of the order under Holden, because I think on the face of it, that appears the most problematic, although it is not. So under Holden, what this Court found is that there were two problems with the restitution order. One was that the district court made no finding that the restitution could not be paid immediately. In this case, the district court made no such finding. The district court did not find that the restitution could not be paid immediately. And in fact, it was made jointly and severally liable with Gagarin's two co-defendants, both of whom had considerable assets. And so there is no, there was no finding made by the district court, and it doesn't logically flow that they couldn't pay it immediately. They probably could have or possibly could have. The second error that the court found in Holden was that the restitution schedule was not made in the alternative to full payment. So this Court found that it was internally inconsistent because the restitution was ordered to, ordered paid both immediately and on a schedule, but not in the alternative. Here, the district court specifically made the restitution payment in the alternative. And that's by using the word balance? Yes. Because the court says due immediately and then balance due in accordance with the schedule. And so the two errors that this Court found in Holden simply don't exist in this case. As to the calculation, though, I think in your brief talked about there being credits in the back-end accounts based on this fraud, but I would have thought they would be owing money in their back-end accounts because of the fraud. Because as I understood it, once the policies are canceled at four months, the people who had sold those policies would owe some money from their, through their back-end accounts for the four to seven month difference. That is true, Your Honor. However, the, so the back-end accounts include policies that were part of the fraud and also policies that were not part of the fraud. And so the back-end accounts would also include credits for other policies that were happening. So the important thing to understand about the back-end account is it's not an account. It's simply a spreadsheet. It's a tracking mechanism to say something, what could possibly happen in the future if certain conditions are met. And because it is entirely speculative and it is not a real, it's not a real asset in any shape or form, there's simply no way, and under this case law the Court is not required to deduct some speculative future happening from the real restitution that is owed to the victim in this case. Go ahead. You have two minutes. Does this Court have any further questions? Okay. No? All right. If there are no further questions, then we would simply ask that this Court. Thank you. Thank you, Your Honor. I'll briefly address the restitution order. Starting with the Holden problems. If Your Honors were to compare the judgment in Holden with the judgment in this case, you would find that both of them are actually phrased the same way. Payment, lump sum payment, you immediately, the balance in the pursuant to, pursuant to the schedule. So that's not a viable distinction, and although Holden did not talk about it, I have gone back to the record, and they are indistinguishable. Second, the district court essentially made the finding that Gagarin couldn't pay immediately the lump sum. Can I just stop you there, though? How do we deal with the fact that Holden didn't talk about that? So I didn't know that the language in Holden was what you just said because it's not in the opinion that it was that, right? You can deal with that, Your Honor, by seeing that as something that was not relevant to the Holden's decision. The fact remains that whether it says balance or not, both judgments say you have to pay this lump sum immediately, and you also have a payment schedule. So I don't think that's a relevant distinction, and I was going to say the district court made essentially a finding that Gagarin couldn't pay the lump sum immediately because the court made a finding that she couldn't pay a fine and she couldn't pay interest, and she's also represented by my office. So that finding was essentially there, again, not a reason to distinguish Holden. And very, very, very briefly about the bank and accounts, it is indisputable that these are real, valuable, contractual benefits. The fact that instead of money being actually deposited in a bank account, the company was keeping track of them makes no difference. An IOU — Sure. So why wouldn't it be reasonable for the district court to think these are clearly not very loyal people to the company, they're not that reliable or honest, they would have been fired for some other thing? Because, well, first of all, that would be pure speculation, Your Honor. These people had worked for IAL for a long time. There is nothing in the records suggesting that they would have been otherwise fired for cause. Nothing. That's pure speculation. Second, whether IAL believed in the end that they are not — that they didn't deserve these bank and accounts has nothing to do with the actual loss calculation that this court must undertake for restitution purposes. Employment matters and restitution purposes, restitution calculation, serve distinct purposes. And that distinction is made clear in the Bassel decision and it is made clear in the Third Circuit decision in Feldman. Those are distinct inquiries. And for our purposes, the relevant inquiry and the correct inquiry is comparing what happened with what would have happened if the defendants acted lawfully. That is this court's law. It is set out in Bassel. The fact that it doesn't feel fair has nothing to do restitution. And I assume that IAL might even be able to recover some other money because she's also suing — they are also suing all these people civilly. So they can go ahead and debate employment matters. For restitution purposes, the correct inquiry requires this court to actually deduct the value of the bank and accounts because they are real, valuable contractual benefits. Thank you, Your Honor. Thank you very much. Thank you, Your Honor. In the case of USA v. Gagarin, it's submitted for decision. And we'll pass. Do you want to take a break? Either now or before McKiffin. He'd like to take a break. All right. We'll take a ten-minute break. We'll be in recess the next ten minutes. All rise.
judges: Gould, Bea, Friedland